May it please the court. My name is Matthew Beasley and I represent the appellants and cross appellees Steven Palacios, Palacios Family Trust and Sarah Nelson. I'd like to reserve five minutes, please, for rebuttal. The appeal we're here today about, at least from our perspective, is related to a calculation. There's three orders that we appeal, the summary judgment order, the reconsideration order, as well as the bench trial order. However, if we just kind of put it all into one thing, it's related to when default actually occurred. We believe that the district court basically miscalculated what consists of what they defined, excuse me, as a quarter. A quarter is three months. They put that out there for us. Three full months, though, is a quarter. In summary judgment we came in and we argued, kind of from a business perspective, where it was first quarter, first quarter, you know, January through March, second quarter, April through June, so forth. That's what we argued. The district court said, no, it's any three months. How was it defined in the agreement? It's defined as quarter. Just a quarter? Yes. And so the general understanding of a quarter is three months. Correct, and I, when the district... January through March, and then March, then April through June. It doesn't have to necessarily segment that way, does it? No, it doesn't, and I, and when the district court came back and said, here's what our definition of a quarter is, while we contested it somewhat in the reconsideration, our main point of contention was, if that's your definition of what a quarter is, you still miscalculated when default took place, because in this case the payments were all due on the 7th, the 7th of the month. So they said in the order, okay, if a payment didn't happen May 7th, by July 7th, you're in default. Well, that's not true. May 7th to July 7th is two months. No, but the last payment was made on April 7th, so there's three consecutive missed payments. April to May, one month. May to June, two months. June, July, three months. That adds up to three months. I would disagree that there's three consecutive missed payments, because April 7th there was a payment made, so the first missed payment is May 7th. June 7th, 2nd, July 7th, 3rd. That's it, three months. June 7th, July 7th. Three months. But that's not, if you consider there was no payment missed in June 3, that adds up to three. I don't understand. May 7th, June 7th. July 7th, default. That's two months, though. You're holding up three fingers! That's two months. You're correct, Your Honor. I'm done. But you understand what I'm saying. May 7th to July 7th is two months. You would agree with that? I wasn't even listening to tell you the truth. What did you say? You said he missed three payments. Right, three consecutive payments. May 7th, June 7th, July 7th. Three. Correct, but that's not what is defined as a quarter. A quarter is defined as three months, so he missed a payment on May 7th. A month later he missed a payment on June 7th, and then a month later he missed a payment on July 7th. That's three months, though. You're taking the approach that May 7th to July 7th is three months. It's not. May 7th to July 7th is two months. May 7th to August 7th. April 7th to May 7th is a month. That's what you're leaving out of your calculation. Correct, because that payment wasn't missed. So why would that be considered a missed payment? We're talking three missed payments in a quarter. When it's due on May 7th, that's a miss. That's miss number one. June 7th is miss number two. July 7th is miss number three. That's three months. I don't understand your math. My math is that May 7th to July 7th is not. Now if you want to go back and say April 7th to July 7th, that is three months. May 7th to July 7th is not three months. May 7th to July 7th is two months. So if your mortgage is due, if your mortgage is due on the first of every month, you pay your mortgage in January. January 1st. And you don't pay your mortgage in February. You don't pay it in March. And you don't pay it in April. Do you think the mortgage company is going to say you only missed two payments? Well, it depends when you don't pay it in April. What if you pay it, April payments on May? Did you say the first, I believe? So you pay your April payment on April 30th. But that's not the facts of this case. It is. It is. If you look at it from the reverse side, honestly, if you look at it from the reverse side, it makes perfect sense. Because Mr. McDonald would have made a payment on August 6th, 2008, 1159 p.m. If he makes that payment and my client says, no, you defaulted, he didn't default. And I think this court would say, no, he didn't default. Because as the note says, if you don't make a payment within any quarter, any three months, if you start counting April, he's already made that payment. It's not part of the quarter. The quarter doesn't start until he misses that first payment. Here's your quarter. OK, you haven't made a payment. May 7th, June 7th, July 7th. But if you make a payment August 6th, you're in that quarter. You're still in that quarter. I mean, I just I'll be frank with you. I just don't buy that reading. But but do you have anything? I mean, we're looking at the same language you are. Is there anything else that you all put in the record to suggest that your reading is the one that the two both sides had in mind? No, because it was an issue we really didn't address at trial because it was done before trial. The summary judgment was very much so. But what about a summary judgment? Was there any extrinsic evidence that the because because, frankly, from your client's standpoint, the reading that I think at least Judge Rawlinson and I have been advocating seems to make more sense from what your client from the standpoint of what your client would have wanted. So that's why I'm wondering, is there something something extrinsic to the agreement itself that supports the reading you're now advocating? I would point you to the letter that was attached to summary judgment, where Mr. McDonald he wrote a letter on May 28th. Do you have the ER site for that? I will. Absolutely. Is that the one where he said he's not going to pay anymore? Correct. Correct. It also it also says in that letter that he's taking advantage of the clause in the in the contract or the promissory note, excuse me, that says he's deferring this payment. Right. Correct. So I think the fact that this came out on May 28th, this was a May 28th letter. Why on May 28th would he be if if if we calculated that the way that you're apparently leaning right at this time, if we calculate it that way, why on May 28th is he saying he's missing his first payment? Because he has missed the payment as of May 7th. And under the agreement, interest is now accruing that he's going to have to pay. Now, he's not going to be in default if he doesn't make, you know, if he gets three. Right. But all he's saying, I think, is that, look, I yeah, I'm on the hook, I guess, for whatever accruing interest. I can't remember if the interest can it was seven percent. Right. But the payments are due. They're due and owing as of the 7th of each month. It's not like the payments were only due on a quarterly basis. They were due at the end at the 7th on the 7th of the month. I'd ask you to look at the promissory note as well, then, because the promissory note tells you also that. And I apologize for moving around here. The promissory note also tells you that if they're not technically late until you don't make a quarterly payment. Right. So technically, these payments are not late until August 6th because the payment hasn't been. Well, they're late in the sense that they are due on the 7th. It's just that the penalty, so to speak, is just that interest will accrue. What you're talking about is that there's not going to be a default. An event of default until you miss three consecutive payments. No, I'm talking about it specifically only addresses late payments in one section of the promissory note. I have it right in front of me. So what are you referring to? Because I read it as saying these payments are due on the 7th of each month. They are due on the 7th. And it doesn't. If you go to the second page of that, then it has a category. You know what I mean? I followed it. If you go to the second page, excerpts 396, I believe it's third excerpts. Three ninety six. I got a different number in front of me. But what what provision of this is on the second page of the note? And it's the second or the first full paragraph, the second paragraph. OK, what does it say about a late? That's the only thing in the entire agreement that says late. You've seen contracts clearly. They generally tell you what late is. Got it. OK, I see. This does not describe what late is, except for here. This is the only place it actually addresses. This is how we constitute late. And here's the penalty for it. Whereas most contracts will say it's considered late if it's not within five days of when the due date or something to that effect, which I think this also will go back to when support to the calculation of the payment being late. When is when is late? When is default? Not until the end of the quarter. And so if he if they don't make the April 7th payment and they instead make it on May 6th, it's not late. It's it's it's fine. But they did make day seven payment. So so then we move to the next month period, which is effectively what we're talking about here. And they didn't make the May 7th payment. And then he wrote the letter that said, you know, I'm deferring this payment. But then you have to start calculating from that point. You don't you can't calculate from April because April's been made. And that's part of that's that's its own separate month payment period. And that's what I use to my brief, obviously, is the are the payment periods. But you when you start determining what's late, if you look at the note, it really doesn't say this is how we constitute late until you get over that quarter. So, I mean, from from my perspective or the way my reading of it, and this is what I've argued all along, is that what the judge came back and said, the district court judge, May 7th to July 7th is not giving the full benefit of it. And if you looked at it from the perspective of Mr. McDonald wanted to keep the company. If he made a payment on August 6th, he wouldn't have been in default. If he made any payment on August 6th, just one, he wouldn't have been in default. And I think if you look at it that way, you have to turn around and determine that the way that my client and I are looking at it is a correct reading of what the intent was. Can I ask you this question? Absolutely. What's the date by which your client ceased to be a shareholder of? I guess it's MSI. Well, that's up for debate. Obviously, we argued that he had been terminated in May and there was a clause in not the promissory note, but the employment agreement that if he was terminated, then he would Mr. McDonald would be required to immediately purchase his shares. So he. But the district court said they didn't determine he had been terminated. And that was there was a whole nother claim. And that's not here today. But so I don't know if he ever did cease to be a shareholder based on what the district court decided. Now, it doesn't matter in this case because that issue is no longer correct. Joined. Correct. Yeah. We didn't appeal that they determined that the only thing we appealed was I'm talking about your your client, not McDonald. I'm talking about your client. And I am speaking to my. Yeah. No, no, no. It was terminated. Right. Now, we also have the appeal related to Mr. McDonald's when the court determined that he was no longer a shareholder. Yeah. And I'm not talking about that. OK. Yeah. But so I mean, the company ceased to exist as of June, as of June, when he when when Mr. McDonald shut the company down in June. So I mean, because this provision that we focus on the two years or or when the note holder, as long as the note holder remains a shareholder, I think everyone misconstrued that as somehow suggesting that we were focused on the one McDonald was, but the note holder is your client. So that's why I was just asking. I mean, obviously, if your client had remained a note, a shareholder through August, there's none of this would matter. We didn't have to write about this quarterly thing. But you're saying your client ceased to be a shareholder. I'm not saying that. What I'm saying is we had argued he had been terminated and then. No, but your your client, was your client still a shareholder? Well, that's that's what I'm saying. My client, we had argued that he had been terminated. And how? How was your client terminated as a shareholder? Not as a shareholder, as an employee, which gets us to an employment agreement, which I doubt you looked at because it's not part of the. But the agreement speaks in terms of your client as a shareholder. Correct. And technically, he still is a shareholder. OK, then then you lose because it says whichever period is later. That's why I was asking this question. I thought you were going to say, well, he seems to be a shareholder as a general. Then I lose if my client is still a shareholder. Right. That's longer than two years. Right. But why would I if it's more than two years, I don't lose default. It's as if default occurs within. I see your point. But I guess my point is it goes back to what was we brought at the district court. At the district court, I think everybody misinterpreted that clause. I think the district court did as well. And focused on Mr. McDonald. But it should be focusing on your client for the duration. And it's a I guess it's a question of when he was no longer a shareholder. If the company shut down in June. Well, that's what I thought you were going to say. But you said today and I and I I was processing through because you're right. You're right. As as I think everybody important, including the district court, we kind of passed up on that agreement. But obviously, when the company shut down in June and when there were no shareholders, they went into receivership in July and it was done. So thankfully, we're past that issue and get back to the calculation issue. And I don't know if you want to talk more about the dates for my calculation or I can I can get to the my declaratory relief. Well, you're running out of time. So then I will wait because I do need to address those issues. Thank you. All right. Thank you. Good morning, may it please the court. Brian Boshi, on behalf of the McDonald parties, I would submit initially that I think my mortgage holder is the same as Judge Rawlinson's and calculates mortgages the same way. June, you know, May 7th, June 7th, July 7th, that's three months. And if you once you've missed that, you've missed that. I don't want to necessarily spend a lot of time on on that issue, because I think the more interesting issue and probably why we're here for our argument probably relates to the loss versus transaction causation. And this court's decision to intervene. I would, however, point out that Mr. Palacios, unless something has changed and we don't believe that it has, never ceased being a shareholder of MSI. In fact, our position is that as soon as Mr. McDonald forfeited and sent the May 28th letter saying he's no longer a shareholder, that all of the shares revert back to Mr. Palacios and he is the only shareholder of MSI. And I understand that the company's business was shut down in June and there was litigation and there was ultimately even bankruptcy, but the company didn't cease existing prior to August 7th of 2008. So again, to the judge's argument and position with counsel, I think that gives yet another reason why that argument fails, in addition to the math that I think I agree with you. Well, does the agreement say that the shares revert back? It does. The promissory note says that if he does the shares never actually belong. They're an escrow. They're an escrow. And if Mr. McDonald forfeits, then Mr. Palacios has the right to exercise or to execute on those 75 percent of shares. That's different than saying they automatically revert. That's why I asked you the question. I understand. What I'm saying is there are no other shareholders. But if he never exercises his right under the agreement to reclaim those shares, they don't automatically revert to him, do they? No, I don't think, my position, my point was whether he executes on the 75 percent of the shares that are an escrow or not, as soon as Mr. McDonald sends the letter on May 28th, there are no other shareholders of the company except Mr. Palacios. So whether he ever executes on those 75 percent shares in escrow or not, on that date, he's it. He's the only remaining shareholder. You're saying he still has his 25 percent that he's held all along. That's correct. And he is still a shareholder. Even now, theoretically, I don't know that the company ever was wound down or dissolved. It may have been in bankruptcy, but he certainly was through August. Looks like to me that Mr. McDonald was better off as a creditor than he was as a shareholder. Well, he wasn't very well off in either instance because he didn't end up recouping any of the money as it was, as it turned out anyway. But you're probably correct, Judge, in that analysis. So to that end, the only other thing I would say about what Mr. McDonald did, and I would come to an appellate court, either the Supreme Court or this court, I have to argue that there was one instance of clear error by a court. In this case, what they're asking this court to do is overturn findings of fact that were made three separate times. There was a motion for summary judgment. There was a motion for reconsideration. And there was a trial. And these issues were discussed and addressed at trial. And there were findings by Judge Due on these issues that, probably that Mr. McDonald was defaulted, finding fact, I believe it's 59, as a shareholder on May 28th. So even putting the mathematical issues aside, even putting everything else aside, this court would have to substitute, would have to make new findings of fact and find clear error three separate times by the district court. And we would submit that that's just, it's not appropriate under these facts  But let me ask you a question that doesn't deal with that. Okay. If I understand the record correctly, the district court held that there was no private right of action in Nevada revised statute section 90.570. The court did find that. So because of that, there was no, and your opposition was trying to get under that. And maybe it would have been beneficial to do so. But in taking a look at that statute, the district court and maybe counsel overlooked section 90.660, which in my review looks unequivocally creates a private right of action for securities violations under section 90.570. So as I understand the record, the court just was looking at 570 and says there's no right of action. But if it had been called to her attention that 90.660 appears unequivocally to create the private right of action for securities violation under section 90.570, then there was a right to bring that forward under the basis of 90.660. Was that discussed at all? Was it raised at the time that she was making a decision that there was no private right of action under 90.570? Well, I don't think we raised that issue at trial. I don't think it was necessarily discussed because we didn't have a closing argument. We didn't discuss anything along those lines. I think we addressed it in our reply brief to this court. I think we had addressed that to the court in our pretrial and post-trial briefing. I would say that the claim was not brought under that specific section. It was brought under 570, and that's where I think the judge, I mean, I think, in our opinion, misinterpreted the statute. Because, as we pointed out in our reply brief, it doesn't really make sense that the Nevada legislature would actually take away rights for citizens and persons to pursue, in this case, securities violations under state law, that it would only be limited to state action, because that actually harms the people that the legislature is trying to protect, and we think that the statute does create that private right of action. The section 90.660 is the one that gives that life. So do we have to reverse this case and send it back for reconsideration under that claim? Well, I think you, I think the panel may have to do that if we, but I think the standard that we're going to have to meet, and I think the burden that we're going to have to show, goes to what I'm about to argue, which is I think that the elements that we would have to prove are the same elements we would have to prove under a 10b-5 claim. And so, you know, and I think I can. I'm going to have to convince your honors that we have loss causation and transaction causation, whether it's a state statute cause or a 10b-5 cause. And so if it's reversed and remanded back, or just reversed, I think it's going to be the same standard. I think that your honors are going to determine that we're entitled to relief under 10b-5, and if we are entitled to relief under 10b-5, we would also be entitled under the Nevada statute as well, because it ultimately is the same statute, which then I guess kind of segues, segues me nicely, unless your honor has another question about that, into the loss causation. Is this actually discussed with the district judge? I mean, was this an issue that was discussed? Did anybody suggest to the district judge that you can, under 90.570, proceed forward because of 90.660? Well, we didn't discuss it at trial. That was, I mean, obviously because there were no legal arguments and no closing arguments brought up. I believe, and I'd have to go back and look at the earlier records, that that was part of the briefing, and there was substantial briefing. This case has been around for almost 10 years. Well, but there's nothing I found in your briefs that brought this up. Briefs on other side, too. I don't believe we addressed your honor's specific point in our reply brief. Our reply was focused more on the fact that we believe that the private cause of action did exist under 570, and I don't think we actually cited 660 in our briefing to this court, but I believe you're right. I believe that a private cause of action under the first section of 570 does exist, and I believe that the legislature was very clear in other statutes, and in further, I think 660 is the one that your honor just pointed out, that that would create a private cause of action. Again, because if not, why would the legislature do something that would actually inhibit the protection that they're trying to afford to individuals? So the district judge was wrong on that point? We think so. We think that she just did not see a private cause of action where there was one. But again, that may be important, it may not be, depending on loss causation. So here's the, I guess, the huckleberry, and I understand the Supreme Court laid down kind of the foundation for this, and then this court and Nuveen set it forth, and that's what Judge Navarro determined, and I think, to be blunt, that Judge Navarro was just mistaken. Nuveen tells us that you have to have both. You have to have transaction causation, you have to have loss causation, and then the Luxembourg case was nice enough to say that in a case like this where you have a private transaction, it's a little bit harder, which makes my job a little bit more difficult in arguing it. But I would say in this case, this isn't a situation where the misrepresentations were about risk or about the stock value may be different. In this case, the misrepresentations that were made were about assets that simply didn't exist. Mr. McDonald paid a purchase price for assets that just simply weren't there. There's a $350,000 account receivable. Let me just ask you about the district court's finding, though, was that the company ultimately failed and caused your client's loss, largely because of, I guess, was it Palacios who decided to take the company in a different direction? That's part of it. And I was going to address that next, but I'll address it now. You say part of it, but the district court sat through the trial, heard all the evidence, and concluded that ultimately the reason your client suffered this loss was not tied, in fact, to the misstatements that were made in the financials, but rather was tied more to the company's change in direction and it ultimately wasn't able to succeed. Probably also the tanking economy had something to do with it, too, I would suspect. Right. So I look at that. It seems like a reasonable factual finding on this record, and I don't go any further. So what's your response to that? Okay. And my response to that would be the company ultimately fails because of the cash flow issues and because of, and again, I don't even disagree with what the judge is saying, that they took on these large public works jobs that the company needed more cash to do. Here's where I think the judge was mistaken, and here's where I think Nuveen does apply. The cash flow problems cannot be separated from the fact that there wasn't a $350,000 asset that the company was supposed to have. It's an account receivable that simply didn't exist. There was $300,000 of equity in the Temecula property that simply didn't exist. There was a $79,000 account receivable that was subsequently almost immediately written off as bad debt. That's $79,000 of revenue that the company simply doesn't have. And so when you talk about cash flow issues and the fact that there wasn't this money to the companies, well, that is absolutely inextricably intertwined with the fact that these assets didn't exist and this money wasn't coming into the company. Except that, I don't think you get credit for all of that missing, all of those missing assets because the judge also found, didn't she, that your client should have, in fact, detected the change between the March and the August financials with respect to certain of those items. Certainly. And I agree with, and I understand your point. Can I just tell me if this is right? Sure. So if that finding, we're also not, because I'm not prepared to say that that was clearly erroneous, if that finding is accepted, then isn't the amount, the disparity in assets shrunk quite dramatically to a couple hundred thousand dollars maybe? No, it isn't because the $350,000 account receivable was on the March financials. The $79,000 account receivable was on the March financials. The $336,000 account receivable that was later written off as bad debt was on the March financials. Those misrepresentations were there in March and they were still there in August. That's where I think the judge made a mistake with respect to that particular calculation because she focused, and this may be my fault because maybe I focused on it too much, she focused more on the discrepancy. There's a discrepancy between August and March and her finding was that Mr. McDonald, as a savvy businessman, should have caught that. My counter to that is that she also made a finding that my client was not looking for fraud and was not, and there's no duty in Nevada to look for fraud. He should not, and it was reasonable for him to rely on the March financials. It was reasonable for him to rely on the verifications in March that Mr. Palacios provided. All of the things I just described were there in March. I'm not talking about the increase in the credit line. I'm not talking about the increase in the accounts payable. I'm talking about the things that were there in March and were still there in August. Fair enough, but nonetheless, what that means, what we'd have to be persuaded of is that but for those misstatements, notwithstanding the companies turn in a different direction, it somehow would have succeeded, and I guess I don't find that plausible. Well, and let me say, and that was getting to the second part of my argument, the company ultimately fails and there's economic loss to that and there's damage to that, and I think that goes more to the misrepresentation claims, the negligent, the intentional misrepresentation claims that Judge Dew just kind of passed over after she made the proximate cause finding. What I would submit is whether or not the company ultimately failed after August of 2006, my client suffered a damage at closing that day when he paid for assets that did not exist. He suffered, and this is where I come back with the Nuveen analysis. The $350,000 account receivable, for example, and there were four of them I think I identified, but that one, that is multiplied by three in the purchase price, and my client pays a million dollars for that asset. Now, even if MSI had prospered and succeeded and gone on and done wonderful things and the note would have gone forward and that claim would have been appealed, it doesn't matter because my client still would have paid a million dollars more than he should have for an asset that did not exist, and that's where I think the proximate economic loss causation that this Court identified as being significant Nuveen is met here because that misrepresentation, and again, this falls into the zone of risk that the Second Circuit has talked about and then this Court has cited, that is a material misrepresentation of an asset that does not exist that Mr. Palacios knows or certainly should know is going to cause damage and is there to induce Mr. McDonald to pay more for the company than he should have, which he did. It is a tangible economic consequence, and on August 7th when he closes escrow and pays that million dollars for that asset that does not exist, he has suffered a damage, whether the company succeeds, whether the company fails, and then as the company ultimately failed and the judge found that there was a cash flow and there were work product issues, I don't think you can completely separate those from the misrepresentations that were made in the March financials because part of the reason that the company didn't have enough cash flow to go forward is, and there was another finding by the judge, Mr. Palacios represented that these were jobs that they were going to do going forward and that was one of the representations he made to Mr. McDonald. The court found, and Mr. Palacios testified, the court determined that Mr. Palacios didn't know how to do these jobs, that that was a misrepresentation of fact that he made prior to closing, and he didn't tell Mr. McDonald that this additional cash was going to be required. So as the company is going forward, and this goes more to the negligent intentional misrepresentation claims post-closing, Mr. McDonald doesn't know what cash flow is going to be required. Mr. Palacios is telling him, well, this is just par for the course. This is what we need. This is what's going on. All these jobs are going to start making us money, and that's where the loans come from, and that's where the economic loss comes from there, but it has nothing to do with the money that he never saw because the assets didn't exist, and that's where I think the economic loss comes from. Yeah, and I just, I hear you, and that is an argument I hadn't focused on. Is that an argument you made in those terms to the district court? Absolutely. We made it to the district court, and I think we've made it in our briefs. I think we've made it significantly in all the pleadings that we've submitted. Okay. Maybe I didn't focus on that. I certainly remember you asking for basically recovery of everything, all the money paid, all the loans, whatnot. Actually, I remember $15 million. That's what we're entitled to. I think that's what I asked for. Yeah, and that's what I'm saying. If that's all you asked for, I can understand why the district court didn't do a separate analysis of the negligent misrepresentation or intentional misrepresentation claims because you're focused on a tiny sliver of the damages you ultimately asked for, and I grant you that there probably is causation with respect to the overpayment for the value of the asset, but I don't remember that argument being carved out as a separate and distinct sub-request for damages. Well, I don't think we made a sub-request for damages. I mean, that's a fair point, Judge. I think that what we did was we asked for all of the damages collectively because I don't think what I'm saying now is with respect to the Nuveen decision, with respect to economic loss in a 10b-5 claim, that window of damages is smaller. That goes up to the close of escrow. That is, did the misrepresentations of fact, do they fall within the zone of risk, do they actually create a tangible economic loss as opposed to kind of a It did. I mean, these created a tangible economic loss on the date of closing. The rest of the damages that we were seeking, again, some of which were punitive damages, related to the things that happened post-closing, that happened to the loans and the loss of value and the money that was paid to Mr. Palacios. And I still think that the judge, you know, kind of swept those claims away when she determined that there was no proximate cause as the securities claim. Because did you say to her, Your Honor, even if you don't give us the whole kit and caboodle, at the very least you have to give us this narrower sliver of damages because we can show causation as to that? I think we set that forth both in our brief and our initial arguments to the judge. I think we laid out exactly what damage we were seeking on each side of the ledger, both pre-closing, during closing, and after closing. And that's why the judge kind of focuses on that in her order. There's the pre-closing. There's the closing. And then she kind of merges the post-closing damages with the date of closing damages, which I think was improper because the 10b-5 claims really stop as soon as the securities are sold. As soon as the securities are purchased, then you either have an economic loss or you don't. And then post-closing, you either have intentional misrepresentation, negligent misrepresentation damages, or you don't. Okay. So where do I look or where would we look to verify that, in fact, you carved out this subcategory of damages for recovery before the district court? To go back and go. No, not in the record. Just like did you guys have like post-trial briefing? Was there a trial brief? Where were we going to look? A trial briefing. We had post-trial briefing. And I believe that some of these issues were brought up in the motion for summary judgment, but I wasn't counsel at that time, so I don't remember that as well. It wouldn't have been resolved. We're not talking summary judgment. We're talking about trial. So, okay. So there's trial briefs and post-trial briefings. There's a trial brief. There was an opening argument. There was a, and then there was post-trial briefing, and I believe that the damages were addressed in those instances. And I think I'm completely out of time, so unless the judges have any questions, thank you for your time this morning, and thank you for hearing argument. Thank you. I'd like to address a couple quick things. The causation, it's not economic loss, what he's talking about. And Naveen was very clear about that. What he's talking about is more of a transactional loss. This company, this company went, and I will get to the $350,000 here shortly, but the company went on for two years. The company didn't shut down. You can read the letter. The company didn't shut down because Mr. McDonald ran out of money. The company shut down because he got tired of putting in money. So the investment could have continued if he wanted to put more money in. The company did not have to shut down. It did not fail. They had work. The problem was the work was expensive, public works. You have to put a lot of money out. That was the problem. So to say that somehow his failed investment is related to this $350,000 is not correct. To say he overpaid because of this $350,000 is not correct. The $350,000 was a note receivable from another subsidiary, we'll call it, of the big company MSI. It was a note. It was also in the March financials, at which time Mr. McDonald circled it and said, what is this? Between March and the time it closed in August, which I asked Mr. McDonald at trial, what did you do to follow up on this? What did you do to find out? I mean, he could have easily found out this was a note from one subsidiary to the main company. But he told me he did nothing. He told me he should have done more, I believe, were his exact words. He should have done more. So to say this is a made-up asset, it's not a made-up asset. Money was loaned from the main company to buy Pacific Sun Nurseries. Not to buy it, excuse me, to buy a piece of land that they had a nursery on. So to sit here and claim there was nothing there is unfair. It's a mischaracterization of what the facts really are. There was an asset. Now, because of the fact he did it, he chose maybe not to look at it that same way as an asset, which my client had, and I'll address that as well real quickly, you can look through the court's order. You can look through my briefing and go through the excerpts of the record. There's testimony from the bookkeeper. There's testimony from the accountants, the CPAs that all says, my client didn't even know how to use QuickBooks. How in the world can he defraud Mr. McDonald and his accountants? I mean, let's not also forget that between the March 6th records and the August, I think, 3rd records or August 4th records, it wasn't just Mr. McDonald that had the records. He gave them to Mr. Beadle, which was his CPA. Mr. Beadle testified. He looked at them, and they looked in order with meeting the projections as stated. And the district court also found that it was not realistic and you couldn't expect them to do a full-scale audit of the financials. There's just too many, right? Correct. So, I mean, I take your opponent's argument to say, let's say they were correct, that your client had fraudulently included a $350,000 asset on the books, that there really was no way for them to detect it as being illegitimate absent doing basically a full-scale audit, which is not reasonable here. If that were true, I think he's right that from a causation standpoint, he would show as well as the fact that the valuation was basically just wasn't tripling the amount of assets. Are we talking about economic loss? I'm not talking about the 10 billion. No, no, no. I'm not talking about that. I'm talking about just regular old negligent intentional misrepresentation, that kind of claim. I don't think there's a loss causation component to that, because I would have shown that I, even if this business had been phenomenally successful, I still would have paid a million dollars, that's what he's saying, a million dollars more for the asset I hold than I should have absent the fraud. And it seems to me that is close enough. Correct. However, first, I mean, I understand that he has told us today, I don't believe there's anything in the record that says he paid three times that to get to a million dollars when he figured out his price. In fact, he even testified at trial that he didn't use that to determine how much to pay. He testified that he used Matthew Wehmeyer, another CPA, that had personally given him these financials. He testified that he used those financials to determine the price to pay. So to say that somehow this is my client made some asset up or he did something improper, he didn't touch the books. He didn't provide them to Mr. McDonald. As you've seen in my briefing, they went through an assistant to the bookkeeper, to the broker. He didn't have anything to do with financials and didn't even have access to the QuickBooks. So to suggest that he somehow made up this asset when Mr. McDonald knew about that asset in March and never asked anything further than circling and saying what is this. I mean, if he had an issue with that, he could have determined that long before he even made the offer because the offer to purchase didn't happen in May. So, I mean, I would just say I understand your point if it was true. Right. But to sit here, you've got to look at all the facts together to see if what he said was correct or incorrect. Got it. All right, counsel. You've exceeded your time. Thank you to both counsel. The case, as argued, is submitted for decision by the court. That completes our calendar for the day and the week. We are adjourned. All rise.
judges: Wallace, Rawlinson, Watford